Marita **ROGERS**

v.

Alan **PLATT** and Kathy
**Platt, Appellants.**

No. 86–7011.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 10, 1986.

Decided March 17, 1987.

As Amended March 24, 1987.

**684**

Stephen M. Schneebaum, with whom Judith Bartnoff, Washington, D.C., was on brief, for appellants.

Stephen A. Fennell, with whom Jeanne E. Davidson, Washington, D.C., was on brief, for appellee.

Before EDWARDS and SILBERMAN, Circuit Judges, and McGOWAN, Senior Circuit Judge.

SILBERMAN, Circuit Judge:

This case stems from an interstate child custody dispute that has given rise to conflicting rulings of the courts of the State of California and the District of Columbia, both of which purport to assert jurisdiction consistent with the Parental Kidnaping Prevention Act. Pub.L. No. 96–611, 94 Stat. 3569 (1980), codified at 28 U.S.C. § 1738A (1982) ("PKPA"). After the rulings, the federal district court in the District of Columbia entertained an action to declare which of the two "state" courts had "jurisdiction under the PKPA"[1] and held that the California court had jurisdiction because, although neither sovereign qualified as the child's "home state," California met the Act's alternative jurisdictional test, which turns on "the best interest of the

---

1. It is not entirely clear whether the PKPA can be accurately described as a statute that confers or withholds state court jurisdiction. A state presumably can decide, wholly for itself, whether or not it wishes to establish a state custody proceeding that has only intrastate effect. The central thrust of the PKPA is to determine under what circumstances a state custody decree is entitled to full faith and credit in another state. But compare section 1738A(g) with the testimony of Professor Coombs: "Although [provisions of the PKPA] by their terms seem to refer to a federal statutory grant of jurisdiction to state courts, they of course do not mean that, but are merely economical expressions referring to the conditions under which [arises a] federal statutory duty to enforce and not modify a custody determination...." *Parental Kidnaping Prevention Act of 1979: Joint Hearing on S.105 Before the Subcomm. on Criminal Justice of the Senate Comm. on the Judiciary and the Subcomm. on Child and Human Development of the Senate Comm. on Labor and Human Resources,* 96th Cong., 2d Sess. 151 n. 34 (1980) (hereafter *PKPA Hearing* ) (statement of Professor Russell M. Coombs).

child." Appellants challenged both determinations, asserting that the District of Columbia was the home state and, alternatively, that properly applying the best interest of the child test leads to the conclusion that the District of Columbia Superior Court properly asserted jurisdiction. We *sua sponte* ordered rebriefing directed to whether the federal courts had jurisdiction over the cause, and Appellants now also challenge the district court's exercise of jurisdiction. We hold the district court lacked subject matter jurisdiction and accordingly do not reach the merits.

## I.

Appellee, Marita Rogers, a California resident, gave birth to a baby boy on June 14, 1985 in a California hospital. Approximately one month before the birth of her son, Ms. Rogers had indicated to her doctor a desire to put the child up for adoption. The doctor contacted a prospective couple, Alan and Kathy Platt, who are residents of the District of Columbia. A few hours after giving birth, Ms. Rogers signed a form releasing her baby to the Platts, who had flown to California after learning from the doctor that Ms. Rogers had gone into labor. Shortly thereafter, Ms. Rogers left the hospital. She never saw the child after its birth. Two days later, the Platts and

the child returned to the District of Columbia, where the child has since resided.

Ms. Rogers subsequently changed her mind about the adoption and, on November 21, 1985, filed an action in California state court to recover custody of the child. The following day the Platts initiated an action in the District of Columbia Superior Court to establish guardianship. Acting first, the District of Columbia court denied a motion by Ms. Rogers to dismiss the Platt's custody petition and asserted jurisdiction purportedly consistent with 28 U.S.C. § 1738A (1982), the operative part of the PKPA. The court also denied Ms. Rogers' subsequent motion to certify the section 1738A issue for interlocutory appeal to the District of Columbia Court of Appeals, but has now stayed the merits of the case, pending the resolution of proceedings in federal court. One month later, the California court also purported to assert jurisdiction consistent with the PKPA and, in addition, awarded custody of the child to Ms. Rogers.

Under the PKPA, a state court's[2] child custody decree must be enforced by all other states if (1) "such court has jurisdiction under the law of such State," and (2) one of the conditions set forth in subsection 1738A(c)(2) is also met.[3] These conditions

---

**2.** The District of Columbia is treated as a "state" under the PKPA. 28 U.S.C. § 1738A(b)(8).

**3.** Section 1738A provides in pertinent part:
(a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.
. . . . .
(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—
(1) such court has jurisdiction under the law of such State; and
(2) one of the following conditions is met:
(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;

(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;
(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse;
(D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or

are not prerequisites for a state's original exercise of jurisdiction over a custody dispute, but rather determine only whether a state's exercise of jurisdiction under its own authority places a federal duty upon other states. Under the first condition, the state court issuing the custody decree must be located in the "home state" of the child on the date of the commencement of the proceeding, or located in the state that "had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State." 28 U.S.C. § 1738A(c)(2)(A). The "home state" is defined as:

the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons.

28 U.S.C. § 1738A(b)(4).

If the court concludes there is no "home state," it may meet the second condition if asserting jurisdiction is in "the best interest of the child" as determined by examining "significant connection[s]" ("other than mere physical presence") the child and the contestants have to the state, and whether "substantial evidence concerning the child's present or future care, protection, training, and personal relationships" is located within the state. 28 U.S.C. § 1738A(c)(2)(B). Even if another state

does meet the home state test, under the third condition, the state may still assert jurisdiction consistent with the statute if "the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse." 28 U.S.C. § 1738A(c)(2)(C). If no other condition of subsection 1738A(c) is met, or "another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child," that state may assert jurisdiction consistent with the statute if "it is in the best interest of the child" to do so. 28 U.S.C. § 1738A(c)(2)(D). Although it is possible that more than one state might meet section 1738A(c)'s requirements, the Statute resolves such a conflict in favor of the state that acts first: a state is prohibited from exercising custody jurisdiction once another state has assumed jurisdiction over the same custody dispute consistent with the Statute. 28 U.S.C. § 1738A(g).

In light of the apparently conflicting interpretations of the PKPA by the California and District of Columbia courts, Ms. Rogers filed a complaint in the United States District Court for the District of Columbia, seeking: (1) a declaration as to which of the two states has custody jurisdiction consistent with the PKPA; (2) an injunction prohibiting the Platts from continuing to litigate in the courts of the District of Columbia; and (3) an order enforcing the California custody decree in the District of Columbia.

(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.
(d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

. . . . .

(f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if—
(1) it has jurisdiction to make such a child custody determination; and

(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.
(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination.

The district court asserted jurisdiction over Ms. Rogers' complaint, following the Third Circuit in *Flood v. Braaten,* 727 F.2d 303 (3d Cir.1984), which concluded that "[a]bsent some tribunal capable of enjoining violations of the strict and uniform requirements of § 1738A, the Congressional policy underlying the enactment would be thwarted." *Id.* at 310. Proceeding to the merits—the construction of the PKPA—the District Court held that neither California nor the District of Columbia was the "home state" because the child had not literally "lived from birth with" either the plaintiff or defendants in either state. The court reasoned that the child did not live "from birth" in the District of Columbia because for the first three days of his life he was in California. And on the other hand, the child cannot be said to have ever "lived with" his mother in California because she did not even see the child after it was born. Following the statutory scheme, the district court then considered the "best interest of the child" and concluded the California court had properly asserted jurisdiction because the child has more significant connections to California: "the child's natural mother lives in California, the mother began litigation over the child in California first, and the child was born in California." Although the child has lived in the District of Columbia during the first year of his life and is present there now, the court discounted that connection because under the statute "physical presence of the child alone is not sufficient or necessary to evoke custody jurisdiction." 641 F.Supp. 381. The Platts appealed to this court.

## II.

Article III of the Constitution permits federal courts to hear all cases "arising under" federal law. U.S. Const. art III, § 2. The scope of this authority has been held to encompass all suits in which federal law is an "ingredient." *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 737, 823, 6 L.Ed. 204 (1824). The constitutional power, however, is not self-executing, and it was not until 1875 that Congress granted federal district courts original jurisdiction over any civil action "arising under the Constitution or laws of the United States or treaties made, or which shall be made, under their authority." Judiciary Act of 1875, 18 Stat. 470 (1875) (codified as amended at 28 U.S.C. § 1331 (1982)). Although the language of section 1331 mirrors the language of Article III of the Constitution, it has long been settled that the statutory grant of "arising under" jurisdiction does not extend to the full limits of the Constitution. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 494–95, 103 S.Ct. 1962, 1971–72, 76 L.Ed.2d 81 (1983). Its exact reach, however, has perplexed both scholars and the federal judiciary almost as long—perhaps inevitably, because there is scant indication that Congress actually intended to draw a narrower boundary. *See Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 8 n. 8, 103 S.Ct. 2841, 2846 n. 8, 77 L.Ed.2d 420 (1983). Apparently, the Supreme Court, reluctant to treat every "arising under" case as a constitutional question and sobered at the implication for diminished state court jurisdiction if the statutory grant were interpreted as coextensive with the Constitution, simply indulged the fiction that Congress, even though using the same language as the Constitution, had not intended the same meaning. *See Romero v. International Terminal Operating Co.,* 358 U.S. 354, 379, 79 S.Ct. 468, 483, 3 L.Ed.2d 368 (1959); *Shoshone Mining Co. v. Rutter,* 177 U.S. 505, 507, 20 S.Ct. 726, 726, 44 L.Ed. 864 (1900); C. Wright, A. Miller & E. Cooper, 13 Federal Practice and Procedure 2d § 3562, at 22–23 (1984). Cut loose from actual congressional intent, the federal courts have struggled to find principled boundaries to the 1875 Act.

■ Justice Holmes, with his characteristic elegant simplicity, originally drew the line at a federal cause of action: "[a] suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne and Bowler Co.,* 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916). The Court, however, unwilling to leave certain federal legal issues embedded in state

causes of action to the exclusive interpretation of state courts (subject albeit to Supreme Court review), subsequently rejected that stopping point and embarked on a more complex journey. *See Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199–202, 41 S.Ct. 243, 244–246, 65 L.Ed. 577 (1921). It is now often said that the Holmes test is more useful for describing the "vast majority" of cases that comprise federal question jurisdiction than it is for defining the limits of that jurisdiction. *See Merrell Dow Pharmaceuticals Inc. v. Thompson*, — U.S. ——, 106 S.Ct. 3229, 3232–33, 92 L.Ed.2d 650 (1986); *Franchise Tax Board*, 463 U.S. at 9, 103 S.Ct. at 2846. Even as an inclusionary principle, the test is not without its exceptions. A formal federal cause of action that incorporates state law so as to create an "overwhelming predominance of state-law issues" may not properly be brought in federal court. *Merrell Dow*, 106 S.Ct. at 3236 n. 12 (citing *Shulthis v. McDougal*, 225 U.S. 561, 569–70, 32 S.Ct. 704, 706–07, 56 L.Ed. 1205 (1912); *Shoshone Mining Co. v. Rutter*, 177 U.S. at 507, 20 S.Ct. at 726).

■ Be that as it may, the Supreme Court long ago abandoned the pure Holmes test as an exclusionary boundary. *See T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir.1964) (Friendly, J.). Under the well-pleaded state claim doctrine announced in *Smith v. Kansas City Title*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577, a case can arise under federal law if the right to relief requires "the resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Board*, 463 U.S. at 13, 103 S.Ct. at 2848. Thus a case could "arise under" within the meaning of section 1331—prior to last summer—without regard to whether Congress intended a

federal cause of action. But in *Merrell Dow Pharmaceuticals Inc. v. Thompson*, — U.S. ——, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), a closely divided Court held that if Congress affirmatively determines that there should be *no* private federal cause of action that is effectively the end of the matter. *Id.* 106 S.Ct. at 3237.[4] In that event, it is no longer necessary for federal courts to consider whether a substantial federal question is a necessary element of a state cause of action because congressional intent not to create a federal cause of action is deemed a proxy for the ultimate question whether or not Congress intended to confer federal jurisdiction. *Id.* at 3232–37. The dissent thought that the two issues were entirely different, that the former was not a proper proxy for the latter, and the latter is, at least theoretically, informed by the 1875 congressional intent. *Id.* at 3242 (Brennan, J., dissenting).[5]

Still, it is apparently common ground for both the majority and dissenters in *Merrell Dow* that if Congress has a specific intent on the ultimate question as to whether a given federal statute does or does not confer federal jurisdiction that, perforce, sweeps aside all other inquiry. *See Merrell Dow*, 106 S.Ct. at 3244 (Brennan, J., dissenting) ("I certainly subscribe to the proposition that the Court should consider legislative intent in determining whether or not there is jurisdiction."). Congress is certainly free to create federal rights or duties and provide for their enforcement *outside* the federal district courts—in effect to modify section 1331—as long as it stays within any constitutional limits, which are by no means clearly identified.[6] Congress, for example, can create special forums for resolving certain classes of disputes, *see, e.g., Eastern States Petroleum Corp. v. Rogers*, 280 F.2d 611, 613–14 (D.C.

---

4. It is by no means clear how far *Merrell Dow* cuts back on the well-pleaded state claim doctrine.

5. Reliance on 1875 legislative intent (which as we have stated is fictional) would appear only an artificial justification for broader federal jurisdiction.

6. *Compare* Rotunda, *Congressional Power to Restrict the Jurisdiction of the Lower Federal*

*Courts and the Problem of School Busing*, 64 Geo.L.J. 839 (1976); Sager, *The Supreme Court, 1980 Term—Foreword: Constitutional Limitations on Congress' Authority to Regulate the Jurisdiction of the Federal Courts*, 95 Harv.L.Rev. 17 (1981); *with* Anderson, *The Government of Courts: the Power of Congress under Article III*, 68 A.B.A.J. 686 (1982); Wechsler, *The Courts and the Constitution*, 65 Col.L.Rev. 1001 (1965).

Cir.1960) (constitutional challenge to a customs duty, although "arising under" federal law, cannot be brought in federal district court because Congress provided that all review of customs decisions be brought in the Customs Court), or can simply provide rules of decision for state courts, *see, e.g.,* 28 U.S.C. § 1738 (1982) (full faith and credit requirement), which are, of course, bound by the supremacy clause to enforce federal law. *Testa v. Katt,* 330 U.S. 386, 389, 67 S.Ct. 810, 817, 91 L.Ed. 967 (1947).

■ We believe that when Congress passed the PKPA it had such a specific intent directed to the issue of federal jurisdiction—an intent *not* to confer power to interpret its provisions on the lower federal courts. The Ninth Circuit, recently faced with the same question, dismissed plaintiff's complaint upon concluding that Congress did not intend to create a federal cause of action when it passed the PKPA, *Thompson v. Thompson,* 798 F.2d 1547, 1559 (9th Cir.1986), *cert. granted,* — U.S. ——, 107 S.Ct. 946, 93 L.Ed.2d 996 (1987), but believed itself bound by *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), to recognize federal jurisdiction. *See Thompson,* 798 F.2d at 1550. We agree essentially with the Ninth Circuit's analysis of the statute and its legislative history, but view that analysis as properly directed to the ultimate issue of federal jurisdiction. We think, furthermore, that the court misapplied *Bell v. Hood.* Although *Bell v. Hood* prohibits a federal court from dismissing a case for lack of jurisdiction on the basis of failure to state a cause of action unless the complaint is patently without merit, *see Bell,* 327 U.S. at 682–83, 66 S.Ct. at 776; *see also Duke Power Co. v. Carolina Environmental*

*Study Group, Inc.,* 438 U.S. 59, 70–71, 98 S.Ct. 2620, 2628–29, 57 L.Ed.2d 595 (1978), it does not preclude a federal court from dismissing for lack of jurisdiction where Congress intended no jurisdiction. *See, e.g., Central Vermont Railway, Inc. v. Brotherhood of Maintenance of Way Employees,* 793 F.2d 1298 (D.C.Cir.1986) (dismissing suit for lack of jurisdiction as required by Norris-LaGuardia Act). In any event, *Merrell Dow mirabile dictu* converts *Thompson's* holding that Congress intended no federal cause of action into a determination that there is no federal jurisdiction.[7] All other circuits that have faced this question, however, have followed the lead of the Third Circuit in *Flood* and both granted federal jurisdiction and provided a federal remedy. *See Hickey v. Baxter,* 800 F.2d 430 (4th Cir.1986); *McDougald v. Jenson,* 786 F.2d 1465 (11th Cir.1986); *Heartfield v. Heartfield,* 749 F.2d 1138 (5th Cir. 1985). We respectfully disagree with these circuits.

It is important to appreciate, in our view, what an unusual, indeed unique, jurisdictional claim this is. Appellees do not assert—nor do any of the other circuits—that the PKPA grants authority to any federal court to take original (or removal) jurisdiction of a custody action. In that respect, this case differs sharply from the *Smith* line of cases recognizing original jurisdiction when a substantial federal issue is embedded in a well-pleaded state claim. The federal jurisdiction claimed here would arise only *after* a state court allegedly commits an error in determining that asserting jurisdiction is consistent with the PKPA— as would apparently be so if courts of two different states both assert jurisdiction over the same custody dispute. What Appellee seeks, then, is quasi-appellate federal

---

**7.** Although *Merrell Dow* predates *Thompson* by two months, the parties in *Thompson* apparently did not bring *Merrell Dow* to the attention of the Ninth Circuit.

It is at least arguable that the PKPA creates a federal cause of action even if it does not create federal jurisdiction. For instance, Appellee here might have a federal cause of action under section 1738A(a) to enforce the California custody decree in the District of Columbia. *See, e.g., Milligan v. Wilson,* 130 So.2d 644 (Fla.Dist.Ct. App.1961) (full faith and credit clause creates a

cause of action to enforce foreign judgments); *Gordon v. Hillman,* 47 Cal.App. 571, 191 P. 62 (Cal.Ct.App.1920) (same). *See also Christmas v. Russell,* 72 U.S. (5 Wall.) 290, 301–02, 18 L.Ed. 475 (1866) (full faith and credit clause does not allow a state to bar a cause of action maintained on a foreign judgment). Under *Mondu v. New York, N.H. & H.R. Co.,* 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327 (1912), a state court must entertain a federal cause of action whenever there is adequate jurisdiction under local laws.

jurisdiction, a reviewing function somewhat akin to habeas corpus proceedings. With this observation in mind, we turn to the Statute's history and structure.

## A.

The PKPA was directed at the problem of parents evading the effect of an existing custody decree by snatching their children and moving to another state. *See Parental Kidnaping, 1979: Hearing Before the Subcomm. on Child and Human Development of the Senate Comm. on Labor and Human Resources*, 96th Cong., 1st Sess. 163 (1979) (statement of Sen. Wallop) (hereinafter *Parental Kidnaping Hearing* ). In the new state, the snatcher might well establish legal custody despite the outstanding custody decree of another state, since it appears—although the Supreme Court has not squarely confronted the issue—that states are not bound under the full faith and credit clause to enforce a child custody decree of another state. *See Ford v. Ford*, 371 U.S. 187, 192, 83 S.Ct. 273, 276, 9 L.Ed.2d 240 (1962). That seems to be so because a state is bound by the decree of another state only to the extent the other state is itself bound, and custody decrees are continually subject to modification in the state issuing the decree as the conditions affecting the child change. *Id.* at 191 n. 2, 83 S.Ct. at 275 n. 2. Prior to the PKPA, a number of states had addressed this problem by adopting the Uniform Child Custody Jurisdiction Act (UCCJA), which established a standard for custody jurisdiction under which only one state, except in rare situations, would have jurisdiction to issue or modify a custody decree.

 The principal problem with the UCCJA, as perceived by Congress, was that not all states had adopted it. As Senator Wallop, one of the PKPA's sponsors, explained:

Because the UCCJA is a reciprocal act and may be freely adopted or rejected by the states, its effectiveness in interstate custody cases depends upon its adoption throughout the country. Although the trend is clearly in this direction, (as of the end of April 1979, 32 states have adopted in the [sic] UCCJA) it may be years before this is accomplished. The price of waiting for this eventuality is too high.... *Parental Kidnaping Hearing* at 167. Congress responded with the PKPA, which in effect required all states to comply with the UCCJA, thereby making the UCCJA truly uniform. The proposed statute was repeatedly and consistently described in the legislative history as implementing a "full faith and credit approach" for custody decrees.[8] The portion of the PKPA at issue here is accordingly codified at 28 U.S.C. § 1738A as an addendum to section 1738, the statutory implementation of the constitutional full faith and credit clause, U.S. Const., Art. IV, § 1. Significantly, neither the constitutional full faith and credit clause nor the statutory implementing provisions provides a predicate for federal jurisdiction. *Minnesota v. Northern Securities Co.*, 194 U.S. 48, 72, 24 S.Ct. 598, 605, 48 L.Ed. 870 (1904); *Wisconsin v. Pelican Insurance Co.*, 127 U.S. 265, 291–92, 8 S.Ct. 1370, 1374–75, 32 L.Ed. 239 (1888). *See also* C. Wright, A. Miller & E. Cooper, 13B Federal Practice and Procedure 2d § 3563, at 50. The full faith and credit clause "has nothing to do with the conduct of individuals ... and to invoke the rule which it prescribes does not make a case arising under the Constitution or laws of the United States." *Minnesota v. Northern Securities Co.*, 194 U.S. at 72, 24 S.Ct. at 605. The constitutional clause and the implementing legislation, in other words, do not constitute a normative standard that

---

**8.** *See, e.g.,* H.R.Rep. No. 96–1401, 96th Cong., 2d Sess. 41 (1980); 126 Cong.Rec. 22806–08 (1980) (statement of Sen. Wallop); 125 Cong.Rec. 758 (1979) (statement of Sen. McGovern); *Parental Kidnaping Prevention Act of 1979: Addendum to Joint Hearings on S. 105 Before the Subcomm. on Criminal Justice of the Senate Comm. on the Judiciary and the Subcomm. on Child and Hu-*

*man Development of the Senate Comm. on Labor and Human Resources,* 96th Cong., 2d Sess. 101, 104 1980) (hereinafter *PKPA Addendum* ) (letter from Assistant Attorney General Patricia M. Wald to Congressman Peter Rodino, Chairman of the House Judiciary Committee); *PKPA Hearing* at 18 (statement of Rep. Bennett).

seeks to govern the conduct of either the executive branch or private individuals. *Cf. Merrell Dow,* 106 S.Ct. at 3243 (Brennan, J., dissenting). Instead, the clause merely "prescribes a rule by which courts, Federal and state, are to be guided when a question arises in the progress of a pending suit as to the faith and credit to be given by the court to the public acts, records and judicial proceedings'* of another state. *Northern Securities,* 194 U.S. at 72, 24 S.Ct. at 605. The obvious importance of this longstanding principle to the interpretation of the PKPA was emphasized by the Ninth Circuit in *Thompson:*

It seems highly unlikely Congress would follow the pattern of the Full Faith and Credit Clause and section 1738 by structuring 1738A as a command to state courts to give full faith and credit to the child custody decrees of other states, and yet, without comment, depart from the enforcement practice followed under the Clause and section 1738. The reasonable assumption is that Congress intended the new statute to be implemented as the Full Faith and Credit Clause and its statutory manifestation, section 1738, have been implemented for two centuries.

798 F.2d at 1556.

We think the Ninth Circuit's assumption was indeed reasonable. Congress, it appears to us, intended to enact only a rule of decision for state courts, since like both the statutory (§ 1738) and constitutional (Art. IV, § 1) full faith and credit provisions, section 1738A, the addendum, is a rule that "has nothing to do with the conduct of individuals" and as such does not create

federal question jurisdiction.[9] This assumption is buttressed by the traditional American practice—manifested in the longstanding bar to extending federal diversity jurisdiction to domestic relations matters and frequently noted in PKPA's legislative history[10]—under which "the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *Ohio ex. rel. Popovici v. Agler,* 280 U.S. 379, 383, 50 S.Ct. 154, 154, 74 L.Ed. 489 (1930) (quoting *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, 853, 34 L.Ed. 500 (1890)). Although it has been asserted that the enforcement of section 1738A against errant states would only require a federal court to determine which state has asserted jurisdiction consistent with the PKPA, not to delve into the underlying merits of a custody dispute, *see Flood,* 727 F.2d at 310; *Thompson,* 798 F.2d at 1562–63 (Alarcon, J., concurring in part and dissenting in part), we agree with the majority in *Thompson* that enforcing the PKPA would ineluctably enmesh federal courts in domestic relations matters. *Thompson,* 798 F.2d at 1558–59. Under Appellee's theory of jurisdiction, a federal court would become involved when two states disagree on the construction of section 1738A, presumably a situation where the proper application of the statute is not dictated by the mechanical "home state" test, 28 U.S.C. § 1738A(c)(2)(A), but rather must be determined by considering the "best interest of the child," 28 U.S.C. § 1738A(c)(2)(B), an inquiry that directly implicates the underlying merits of a custody dispute.[11] Indeed, that is precisely what

---

**9.** As Appellee points out, section 1738A apparently does more than simply require state courts to give full faith and credit to out-of-state custody decrees (*but see* note 1 *supra*); subsection (g) obliges state courts to respect out-of-state custody proceedings even before the proceeding results in a decree. But that Congress meant to mandate somewhat earlier respect for out of state custody proceedings than would ordinarily be required by the full faith and credit clause, if it were applicable, does not demonstrate that Congress, despite repeated descriptions of the statute as a "full. faith and credit approach," meant to provide different jurisdictional treatment.

**10.** *See, e.g., PKPA Addendum* at 102 (Wald letter); *Parental Kidnaping: Hearing on H.R. 1290 Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 96th Cong., 2d Sess. 14 (exchange between Congressmen Fish and Conyers); *PKPA Hearing* at 146–47 (statement of Professor Russell M. Coombs); *Id.* at 49 (statement of Paul Michel, Acting Deputy Attorney General).

**11.** In determining the "best interest of the child," the statute instructs the court to consider "significant connections" the child, parents, or a contestant may have to the state in question, and also the availability of substantial evidence

happened here; the district court felt obliged to resolve the jurisdictional dispute by weighing the value of the parties' connections to the two competing states, and in so doing the court seems to have preferred the claim of the natural mother to that of the adopting parents.

Nothing in the language of section 1738A implies a departure from the traditional jurisdictional treatment of the full faith and credit clause or from the hoary practice of reserving domestic relations matters to the states. The Statute, after all, is explicitly addressed to *states:*

> "The appropriate authorities of every *State* shall enforce ... any child custody determination made consistently with the provisions of this section...."

28 U.S.C. § 1738A(a) (emphasis added);

> "A court of a *State* shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section...."

28 U.S.C. § 1738A(g) (emphasis added). And, although the statute speaks in mandatory terms, *e.g.,* "a state shall," the noncoercive language of the Act's purposes set forth in the statute itself at least further suggests that Congress' intent was to encourage and facilitate the cooperative reso-

lution of interstate custody disputes, not to mandate interstate uniformity by federal court enforcement of the statute. *See Thompson,* 798 F.2d at 1552–53. The general purposes of section 1738A, which were taken verbatim from UCCJA, are, *inter alia,* to "*promote cooperation* between State courts ... *facilitate* the enforcement of custody and visitation decrees of sister States ... *discourage* continuing interstate controversies over child custody...." PKPA § 7(c), (emphasis added).

Perhaps most important, the legislative history discloses that with respect to this statute—unlike so many others—Congress specifically considered whether to confer federal jurisdiction. Frequently referred to in the legislative proceedings was a letter to the Chairman of the House Judiciary Committee from then Assistant Attorney General, Patricia M. Wald,[12] which opposed legislative proposals that would create federal authority to enforce state custody decrees. *See PKPA Addendum* at 104. To be sure, the proposals that the Wald letter warned against would have created federal jurisdiction (either diversity or federal question) to enforce a state custody decree even before a second state had acted, but the letter's recommendations were based on concerns that transcended that procedural nicety. "[D]omestic relations questions, particularly those involving child custody, have traditionally and exclusively been reserved to state courts, which have

---

concerning the child's "present or future care, protection, training, and personal relationships." 28 U.S.C. § 1738A(c)(2)(B). A court cannot possibly determine what connections are "significant" without passing judgment as to the relative importance of the child's ties to the contestants. Nor is it possible to consider the relative availability of "substantial evidence" concerning the child's future well-being without reference to what facts are most relevant to the ultimate custody determinations.

A holding under section 1738A(c)(2)(C) would also involve the underlying merits. That section, which unlike section 1738A(c)(2)(B) is applicable regardless of the "home state" test, permits a state to assert jurisdiction consistent with the Act if "the child has been abandoned," 28 U.S.C. § 1738A(c)(2)(C)(i), or "threatened with mistreatment or abuse," *Id.* at § 1738A(c)(2)(C)(ii). As the court in *Thompson* observed, "it is incontestible that in any case in which the first state assumed jurisdiction under

section 1738A(2)(C) the federal court would be compelled to resolve the question of abandonment or mistreatment, a question that in all probability would also be highly relevant if not determinative in the resolution of the merits of the custody dispute." *Thompson,* 798 F.2d at 1559.

The merits are similarly implicated by section 1738A(c)(2)(D), which envisions a state exercising jurisdiction if "it is in the best interest of the child" when no other state meets the conditions of section 1738A(c)(2) or other states with jurisdiction have declined to exercise it because the state at issue is the more appropriate forum.

**12.** Although addressed to the House committee, the Wald letter was also referred to in the Senate proceedings. Senator Wallop quoted extensively from the letter in his remarks to the Senate floor. *See* 125 Cong.Rec. 739. *See also PKPA Hearing* at 147 (statement of Professor Coombs).

developed an expertise in such matters heretofore lacking in federal courts." *Id.* at 102.

These same concerns were evident in an exchange between Congressmen Conyers and Fish during hearings on various bills to address the parental kidnapping problem. Congressman Fish had introduced a bill—one of the legislative proposals criticized in the Wald letter—that would have given federal courts diversity jurisdiction to enforce state custody decrees and was testifying in support of his bill. Contrasting the "Bennett proposal," relevant parts of which eventually became section 1738A, with Fish's alternative, Congressman Conyers began the colloquy:

> MR. CONYERS. Could I just interject, the difference between the Bennett proposal and yours: You would have enforcing the full faith and credit provision, the parties removed to a Federal court. Under the Bennett provision, his bill would impose the full faith and credit enforcement on the State court.
>
> It seems to me that that is a very important difference. The Federal jurisdiction, could it not, Mr. Fish, result in the Federal court *litigating between two State court decrees;* whereas, in an alternative method previously suggested, we would be imposing the responsibility of the enforcement upon the State court, and thereby reducing, it seems to me, the amount of litigation.
>
> Do you see any possible merit in leaving the enforcement at the State level, rather than introducing the Federal judiciary?
>
> MR. FISH. Well, I really think that it is easier on the parent that has custody of the child to go to the nearest Federal district court. . . .
>
> MR. CONYERS. Of course you know that the Federal courts have no experience in these kinds of matters, and they would be moving into this other area. I am just thinking of the fact that they have "speedy trial" considerations, antitrust, organized crime, the RICO statute, bankruptcy matters, and here on the average of a 21–month docket, you would

now be imposing custody matters which it seems might be handled in the courts that normally handle that. . . .

*Parental Kidnaping: Hearing on H.R. 1290 Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 96th Cong., 2d Sess. 14 (1980) (emphasis added). Apparently following the recommendations of the Wald letter, Congress ultimately rejected not only Congressman Fish's proposal and similar bills, but also attempts to enact federal criminal sanctions for parents who kidnap their children and move them across state lines in violation of a valid custody decree—legislation that, like the Fish proposal, would have provided for direct federal intervention into the traditional area of state regulation.

Appellee contends Congress' rejection of Congressman Fish's proposal creating diversity jurisdiction over child custody matters for federal courts does not necessarily indicate that Congress meant to reject what it argues is a lesser grant of jurisdiction asserted here, *e.g.,* to resolve a conflict between two state courts as to their interpretation of the PKPA. That argument would be persuasive if Congress' ostensible reasons for rejecting the Fish proposal did not also apply to the federal jurisdiction appellee claims. But we think they plainly do. The Fish proposal was rejected, as Congressman Conyers explicitly argued, because it would have added to the dockets of federal courts already overburdened with cases of compelling *federal* concern and would have required federal judges to determine child custody matters, a subject with which they have no experience. Appellee's jurisdictional theory runs afoul of these same considerations. As we have discussed, federal judges cannot normally referee between competing state court interpretations of the PKPA in an antiseptic procedural fashion. More likely, they will be obliged to consider the "best interest of the child," and that task, from all indications, is not one Congress wished to entrust to federal judges. Not because it is unimportant—we can hardly imagine a more important question—but rather because federal judges are inexperienced in that area of the law. Moreover, Congress-

man Conyers foreshadowed the precise question with which we are presented when he warned against a federal court "litigating" between two state court decrees. We take his point to include considerations of institutional unseemliness, *i.e.*, lack of respect for state sovereignty, perhaps most implicated in domestic relations matters.

### B.

As we have noted, three circuits have now followed *Flood* and held that federal jurisdiction lies in this type of case. None, including *Flood*, however, concluded that Congress created an implied right of action when it passed section 1738A.[13] Indeed, having eschewed an implied cause of action theory, *Flood*, in truth, lacks a doctrinal basis for federal jurisdiction. Unlike the Eleventh Circuit in *McDougald*, the Third Circuit did not explicitly seek to bring the case within the second prong of "arising under" jurisdiction; it did not even discuss the *Smith* line of cases. Instead, it rested federal jurisdiction on two propositions: (1) Congress did not intend to preclude the "limited" jurisdiction it fashioned, and (2) the statute would not work as well without it. *Flood*, 727 F.2d at 310, 312.[14] The court reached the first conclusion by distinguishing between federal jurisdiction in the "first instance," which it concedes Congress did not intend, and federal jurisdiction in the "limited circumstances of noncompliance with section 1738A." *Id.* at 312. It is not entirely clear to us what *Flood* meant by the latter type of jurisdiction. The court described the issue before it as "if a *state* court does not comply with the mandates of section 1738A—whether by asserting jurisdiction over a child custody case in violation of section 1738A or by refusing to enforce another state's custody

decree in violation of § 1738A—may a *federal* court ever be employed to correct such a violation of federal law." *Id.* at 307 (emphasis added). *Flood*'s federal jurisdiction, then, is not predicated on a conflict between two state courts, but would permit a federal court to enjoin a state court as soon as it allegedly misapplied section 1738A. The court apparently concluded that although Congress clearly did not want federal courts *enforcing* properly issued out-of-state custody decrees, *id.* at 310, it wished federal courts to *enjoin* improperly issued ones. *Id.* We find that distinction, in light of the statute and its legislative history, wholly unpersuasive. We think the jurisdictional claim, moreover, is no stronger if it is limited to the facts presented here—where two state courts are in actual conflict. It is, in either event, an assertion of appellate or supervisory jurisdiction over what *Flood* referred to as the otherwise "unpoliced discretion" of the state courts. *Id.* at 312. Federal district court jurisdiction to review a state court's application of a federal law, it might be thought, is a greater assertion of federal judicial power than federal diversity jurisdiction to accept custody cases in the "first instance." Federal review of state court decisions so vividly encroaches on state sovereignty that it is normally exercised only by the Supreme Court. *Cf. Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 338–50, 4 L.Ed. 97 (1816). Not only can we not find, as we have discussed, any congressional intent to support this extraordinary grant of appellate jurisdiction, we think, in light of its unique character, it should not be easily inferred. Congress, never having granted federal courts this

---

**13.** *Flood*, 727 F.2d at 307 n. 13 ("This appeal does not require us to resolve an 'implied cause of action' issue"). *See McDougald*, 786 F.2d at 1477 ("Because we are not being asked to imply a grant of federal jurisdiction in section 1738A, we need not conduct an exhaustive inquiry into the intent of Congress in passing the PKPA."); *See also Hickey*, 800 F.2d at 431; *Heartfield*, 749 F.2d at 1140–41 (relying heavily on *Flood*).

**14.** The court also refers to the need to provide a remedy to protect a federal right, *see Flood*, 727

F.2d at 312, but does not define the right except as it is implicitly defined by the remedy the court fashioned: apparently a right to have state courts properly apply a federal statute, which can only be ensured by federal district court review. That seems to assume the conclusion. As we have pointed out, the PKPA was not designed to affect private or executive branch conduct, so it seems the discussion of private federal rights is out of place.

type of jurisdiction, is not likely to do so without explicit direction.[15]

The Eleventh Circuit, although it also did not focus on the peculiar appellate nature of this claim, sought to bring it within the more orthodox *Smith* line of cases, treating it as a state-created cause of action containing a substantial federal issue. *McDougald,* 786 F.2d at 1478–80. With all respect, we think that the *Smith* line of cases does not support jurisdiction here. At bottom, the second prong of the "arising under" test was fashioned to assure a measure of conformity in the interpretation of federal law concerning which federal judges are deemed expert. *Merrell Dow,* 106 S.Ct. at 3242 (Brennan, J., dissenting). But, as we have explained, the sort of section 1738A case likely to reach federal court would probably turn on the question of what is the "best interest of the child," which is traditionally a matter of state concern—an area where federal judges are, at least *as federal judges,* virtual neophytes. Furthermore, the well-pleaded state claim doctrine is limited to a case that could originally be brought in federal court and thus cannot extend to a case such as this where federal claim is asserted only after a state court allegedly commits error. For that reason, federal jurisdiction, if it were to lie here, necessarily would be based on the doctrine that apparently *all* circuits disavow—an implied federal cause of action. And as noted earlier, *see* note 8 *supra,* if the PKPA were interpreted to imply a federal cause of action even in the absence of legislative intent directed at jurisdiction, it does not follow that federal jurisdiction exists. We still would be obliged to consider whether the action presents an "overwhelming predominance of state-law issues." *Merrell Dow,* 106 S.Ct. at 3236 n. 12. For the reasons discussed above, we think that is clearly so here.

A careful examination of the cases in our sister circuits reveals the key factor underlying their decisions to be the Third Circuit's conclusion that a federal remedy is needed to give practical effect to the congressional scheme: "[a]bsent some tribunal capable of enjoining violations of the strict and uniform requirements of § 1738A, the Congressional policy underlying the enactment would be thwarted." *Flood,* 727 F.2d at 310. But as we understand congressional purpose—its policy as formed into legislation—it was merely to create the legal situation that would have otherwise existed if *all* states had adopted the UCCJA. The Third Circuit appeared to believe that more modest aim unworthy of Congress: "Had [Congress] wanted to leave compliance with these stricter[16] provisions to the unpoliced discretion of the states, it is doubtful whether it would have acted at all." *Id.* at 312 (footnote omitted). We think the Third Circuit's conclusions are not supported by anything Congress said or did and, therefore, we reluctantly conclude that they reflect only a judicial view of wise public policy. Undeniably, Congress changed the prior legal framework by creating more uniformity than previously existed.[17] Whether Congressman Fish was right when he argued in vain that "it is easier on the parent that has custody of the child to go to the nearest Federal district court" is surely not for us to decide. "The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *California v. Sierra Club,* 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981). "It is not our task to make an imperfect statute perfect." *Central Vermont Railway,* 793 F.2d at 1303.

In sum, we hold that in light of the legislative history, the words of the statute and its location in the U.S. Code, the ab-

**15.** *Cf.* Habeas corpus jurisdiction. 28 U.S.C. § 2241 (1982).

**16.** As we have seen, these requirements are not all that strict; reasonable judges could well differ as to the best interest of the child.

**17.** Even had Congress explicitly or implicitly created a federal appellate right of action in the federal district courts, that would not necessarily have created instant uniformity of interpretation of the PKPA. District courts and circuit courts might well have differed, particularly as to how the best interest of the child test should be applied, requiring the same eventual Supreme Court review that is available with respect to state court decisions.

sence of any reference to federal courts was the product of a deliberate congressional judgment that the jurisdiction of the federal courts not be expanded.[18] Our conclusion applies whether Appellee's claim is characterized as a federal cause of action or as a state custody action dependent on federal law. We therefore reverse the judgment of the district court and remand the case with instructions to dismiss for lack of subject matter jurisdiction.

*It is so ordered.*

HARRY T. EDWARDS, Circuit Judge, concurring:

For the most part, I am in agreement with the thoughtful and thorough opinion of my colleague, Judge Silberman. I concur in the conclusion that the District Court lacked subject matter jurisdiction over this case, and accordingly, should have dismissed the action. I write briefly, however, to underscore my view of the principal issue in this case and of the relevancy of *Merrell Dow Pharmaceuticals Inc. v. Thompson,* — U.S. —, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

The central issue, as I see it, is whether Congress, when it enacted the Parental Kidnaping Prevention Act ("PKPA"), intended to confine all issues involving the application and interpretation of the PKPA to adjudication in the state courts. It is clear from the language and the legislative history of the PKPA that Congress so intended.[1] Therefore, whether or not the

PKPA creates a cause of action—an issue which is not, and need not be, addressed in this case—the lower federal courts lack jurisdiction to entertain claims arising under the PKPA.[2] This is true both as to claims asserting a cause of action under the PKPA as well as claims requiring the interpretation or application of the PKPA as an element of a well-plead state-based cause of action.

Given the posture of this case, I think that the Supreme Court's recent decision in *Merrell Dow Pharmaceuticals Inc. v. Thompson* touches on this case only peripherally. *Merrell Dow* merely confirms that if a federal statute raises no federal cause of action anywhere (*i.e.,* either in federal *or* state court) and only an insubstantial federal question as part of a state-based claim, then a federal court obviously is without *jurisdiction* to hear the case. In the instant case, because we know that Congress intended to deny the lower federal courts jurisdiction to entertain claims arising under the PKPA, it is irrelevant whether or not Congress intended to provide a federal remedy in state courts for the violation of the PKPA; therefore *Merrell Dow* sheds no light on the issue of whether there is federal question *jurisdiction* because "federal law creates the cause of action" or because " 'the vindication of a right under state law necessarily turn[s] on some construction of federal law.' " *Id.* 106 S.Ct. at 3233 (quoting

---

**18.** Our holding is in accord with *Bennett v. Bennett,* 682 F.2d 1039 (D.C.Cir.1982), a case involving the domestic relations exception to diversity jurisdiction, where we commented on the provisions of the PKPA: "We note that conspicuously absent from this comprehensive enactment is any provision creating or recognizing a direct role for the federal courts in determining child custody. Indeed, the legislative history of the Act makes clear that Congress deliberately and emphatically omitted such a role." *Id.* at 1043 (footnote omitted).

In a separate opinion, concurring in part and dissenting in part, Judge Edwards argued that the domestic relations exception should not bar diversity jurisdiction to *"enforce* an otherwise valid state custody decree," *id.* at 1045, because the enforcement of the state decree did not require a federal court to inquire into "the present best interests of minor children." *Id.*

Here, however, as we have discussed, the "jurisdictional" determination we would have to make under the PKPA might well explicitly and exclusively involve "the best interest of the child." 28 U.S.C. § 1738A(c)(2)(B).

**1.** Because I find that Congress intended to withhold whatever jurisdiction the district courts might otherwise have had to entertain claims involving the application and interpretation of the PKPA, I express no view on the extent to which the congressional grant of federal question jurisdiction to the district courts differs from the limits set forth in Article III of the Constitution, or the reasons that might underlie such a difference.

**2.** As noted in the majority opinion, we do not express a view as to the constitutionality of such a restriction on federal court jurisdiction.

*Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983)).

The main point here is that the language and legislative history of the PKPA make it clear that, whatever rights or duties may arise under the statute, the federal district courts have no jurisdiction to enforce them. Thus, whether we find that the PKPA creates a cause of action in state court or conclude that the statute is inconclusive on this point, *Merrell Dow* is inapposite. In my view, it is unnecessary to offer any interpretations of *Merrell Dow,* and I am unwilling to speculate as to the effect that *Merrell Dow* may have on the contours of federal question jurisdiction.

McGOWAN, Senior Circuit Judge:

I join the separate concurring opinion of Circuit Judge Edwards.