**Linton Roy EVANS**

v.

**Esther Anne EVANS.**

No. 3–87–0533.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 26, 1987.

reasons for terminating the plaintiff shall be        examined.

Jay S. Bowen, Bass, Berry & Sims, Susan S. Garner, Nashville, Tenn., for plaintiff.

Henri McDaniel, Amy Sladen, Huntsville, Ala., John Southworth, Jr., Brentwood, Tenn., Ames, Southworth & Crain, for defendant.

## MEMORANDUM

WISEMAN, Chief Judge.

Plaintiff has moved this Court for a temporary injunction, enjoining defendant from: (1) prosecuting a pending child custody proceeding in an Alabama court; (2) litigating child custody or visitation rights with respect to the parties' minor child in any court except the Chancery Court of Rutherford County, Tennessee; and (3) interfering with plaintiff's visitation rights as set by the Chancery Court of Rutherford County, Tennessee. For the reasons stated below, the Court denies plaintiff's application for temporary relief and dismisses plaintiff's complaint for lack of subject-matter jurisdiction.

### I. *Factual Background*

Plaintiff Linton Roy Evans and defendant Esther Anne Evans were divorced in Huntsville, Alabama on July 23, 1984. At that time, the parties executed a settlement agreement which was incorporated by reference into the final divorce decree issued by the Circuit Court of Madison County, Alabama, Family Court Division.[1] The settlement agreement awarded custody of the parties' minor child, Tammy Lynn Evans, to defendant and granted "reasonable" visitation rights to plaintiff. According to the agreement, the parties were to agree upon the specific terms of plaintiff's visitation rights at a future time. The parties, however, proved unable to agree upon proper visitation rights.

Consequently, on or about October 31, 1986, plaintiff filed a petition in the Chancery Court of Rutherford County, Tennessee (Tennessee Court), asking the court to register the July 23, 1984 Alabama divorce decree and to set appropriate visitation rights.[2] On February 4, 1987, the Tennessee Court held a hearing on plaintiff's petition at which Chancellor Whitney Stegall rendered an oral judgment registering the divorce decree and granting plaintiff certain visitation rights.[3] Chancellor Stegall, however, did not sign a written order to that effect until approximately 3:45 p.m. on March 17, 1987.

Immediately following Chancellor Stegall's February 4, 1987 oral judgment, defendant removed herself and Tammy Evans to Madison County, Alabama. At approximately 4:15 p.m. on March 17, 1987, just one-half hour after Chancellor Stegall signed the above-referenced written order, defendant filed a petition in the Circuit Court of Madison County, Alabama (Alabama Court), seeking to modify the July 23, 1984 Alabama divorce decree. The petition also sought an *ex parte* order terminating plaintiff's visitation rights and restraining plaintiff from coming in contact with either defendant or Tammy Evans pending a final hearing on defendant's petition for modification. In her petition, defendant alleged that plaintiff's present wife, Cathi Evans, sexually molested Tammy Evans during plaintiff's visitation peri-

---

1. At the time the divorce decree was issued, both parties, as well as the parties' minor child, Tammy Lynn Evans, were residents of Madison County, Alabama.

2. Plaintiff and Tammy Evans had resided in Rutherford County, Tennessee for at least six consecutive months prior to the filing of plaintiff's petition. The Tennessee Court, therefore,

had jurisdiction to set visitation rights under Tennessee law. *See* Tenn. Code Ann. § 36–6–203 (1984).

3. Plaintiff was granted the right to visit with Tammy Evans every other seven day period, commencing on February 18, 1987.

ods. On March 18, 1987, the Alabama Court granted defendant's request for preliminary injunctive relief.[4] Plaintiff then moved to dismiss defendant's petition and to dissolve the restraining order issued by the Alabama Court.

On April 7, 1987, Chancellor Stegall, in a letter to Judge S.A. Watson, Jr. of the Alabama Court, assured Judge Watson that the Tennessee Court would resolve all issues raised by the Evans' custody dispute. Subsequently, the Tennessee Court issued orders reasserting and retaining continuing jurisdiction over all matters pertaining to the Evans' dispute, granting plaintiff supervised visitation rights, and appointing a *guardian ad litem* for Tammy Evans. Despite Chancellor Stegall's assurances and the issuance of these orders, however, the Alabama Court denied plaintiff's motions to dismiss defendant's petition and to dissolve the March 18, 1987 restraining order, claiming that, under Alabama law, it had continuing original and emergency jurisdiction to modify the July 23, 1984 Alabama divorce decree.[5]

Faced with inconsistent and conflicting state court custody determinations, plaintiff filed a complaint in this Court alleging that the Alabama Court violated the Parental Kidnapping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A (Supp.1987), by failing to enforce the Tennessee Court's March 17, 1987 order. The complaint alleged that federal subject-matter jurisdiction existed under 28 U.S.C. § 1331 and sought declaratory and injunctive relief. The questions raised by plaintiff's complaint are: (1) Whether the PKPA, either expressly or impliedly, creates a private federal cause of action to determine which of two sister state's conflicting child custody decrees is valid? and (2) If the PKPA does not create a private federal cause of action, whether plaintiff's claim nevertheless "arises under" federal law?

## II. *The PKPA*

The PKPA's primary purpose[6] was "to reduce the incentive for parental child-snatching created by refusal of a significant number of states to give effect to the child custody decree of other states." *Thompson v. Thompson*, 798 F.2d 1547, 1553 (9th Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 946, 93 L.Ed.2d 996 (1987) (No. 86–964). Towards that end, the PKPA mandates that "[t]he appropriate authorities of every State shall enforce according to its terms, ... any child custody determination made consistently with the [PKPA] by a court of another State." 28 U.S.C. § 1738A(a). A state court may modify a sister state's custody determination only if: "(1) it has jurisdiction to make such a child custody determination; *and* (2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination." 28 U.S.C. § 1738A(f) (emphasis added). A custody determination is made consistently with the PKPA if the court making the determination has jurisdiction under its own state law *and* one of the PKPA's jurisdictional touchstones is met. *See* 28 U.S.C. § 1738A(c).

The Court has no doubt that the Alabama Court ignored and clearly violated the prohibitions of the PKPA. The Court also has no doubt that the defendant removed herself and Tammy Evans to Madison County, Alabama for the sole purpose of avoiding the directives of the Tennessee Court's custody determination. If the Court believed it had the power to entertain this action, it would not hesitate to exercise that power in plaintiff's favor.

---

4. The Alabama Court terminated plaintiff's visitation rights, restrained plaintiff from coming around either defendant or Tammy Evans, ordered defendant not to take Tammy Evans to Tennessee for visitation with plaintiff, and directed that any visitation of Tammy Evans by plaintiff be in the presence of a Madison County, Alabama social worker.

5. In his motion to dismiss defendant's petition, plaintiff did not raise the Parental Kidnapping

Prevention Act (PKPA), 28 U.S.C. § 1738A, as grounds for dismissal. As indicated by references to the PKPA throughout its order, however, the Alabama Court was well aware of the Act's existence.

6. For a detailed account of Congress' findings and declaration of purposes for the PKPA, *see*, 28 U.S.C. § 1738A note (Supp.1987).

This type of case cries out for federal intervention. For the reasons that follow, however, the Court concludes that it does not have the power to answer those cries.

■ The questions presented by this case are ones of first impression in this circuit. Fortunately, however, this Court is not without guidance. The proper role of federal courts under the PKPA is an issue that has been the subject of considerable litigation in other circuits, resulting in three conflicting strains of court decisions. The Courts of Appeals for the Third, Fourth, Fifth, and Eleventh Circuits, as well as a number of federal district courts, have held that federal courts have subject-matter jurisdiction to resolve conflicting sister state custody determinations under the PKPA, and have reached the merits of the claims before them. *See Meade v. Meade,* 812 F.2d 1473 (4th Cir.1987); *Hickey v. Baxter,* 800 F.2d 430 (4th Cir.1986); *McDougald v. Jenson,* 786 F.2d 1465 (11th Cir.1986); *Heartfield v. Heartfield,* 749 F.2d 1138 (5th Cir.1985); *DiRuggiero v. Rogers,* 743 F.2d 1009 (3d Cir.1984); *Flood v. Braaten,* 727 F.2d 303 (3d Cir.1984). The Court of Appeals for the Ninth Circuit, along with one federal district court, has held that subject-matter jurisdiction exists,[7] but that actions brought pursuant to the PKPA fail to state a claim on which relief can be granted. *See Thompson,* 798 F.2d 1547 (9th Cir.1986); *Leyda v. Roach,* 650 F.Supp. 951 (S.D.Iowa 1987). Finally, the Court of Appeals for the District of Columbia Circuit and one federal district court

have held that subject-matter jurisdiction does not exist in such cases. *See Rogers v. Platt,* 814 F.2d 683 (D.C.Cir.1987); *Crouse v. Creanza,* 658 F.Supp. 1522 (W.D.Wis. 1987). *See also Meade,* 812 F.2d at 1478–83 (Boyle, J. concurring). This Court finds the reasoning of the D.C. Circuit and the Western District of Wisconsin persuasive and accordingly dismisses plaintiff's complaint for lack of subject-matter jurisdiction.[8]

### III. *Subject Matter Jurisdiction*

Article III of the Constitution states that "[t]he judicial power shall extend to all cases ... arising under this Constitution, the laws of the United States, and treaties made, or which shall be made under their authority." *U.S. Const.* art. III, § 2. The Article III judicial power encompasses all suits in which federal law is an "ingredient." *See Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 737, 823, 6 L.Ed.2d 204 (1824). It is important to remember, however, that Article III is not self-executing and that federal courts are courts of limited jurisdiction. It was not until 1875 that Congress granted federal district courts original jurisdiction over civil cases "arising under" federal law. *See* Judiciary Act of 1875, 18 Stat. 470 (1875). Congress has since codified that original grant of jurisdiction at 28 U.S.C. § 1331 (1982).

28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Consti-

---

7. The Ninth Circuit's conclusion in *Thompson* that subject-matter jurisdiction exists in this type of action was based on an erroneous interpretation of *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed.2d 939 (1946). The Ninth Circuit concluded that "federal question jurisdiction exists unless the cause of action alleged is patently without merit." *Thompson,* 798 F.2d at 1550. *Bell v. Hood,* however, simply stands for the proposition that *if* it is clear that a violation of a federal statute gives rise to a claim that "arises under" federal law, a district court cannot dismiss the case for lack of subject-matter jurisdiction, unless the claim is "immaterial" and made solely to obtain federal question jurisdiction or the claim is "wholly insubstantial and frivolous." *Bell,* 327 U.S. at 682–83, 66 S.Ct. at 776–77, 90 L.Ed. at 942–43.

8. Even if this Court held that it had subject-matter jurisdiction over plaintiff's claim, it may not have the power to grant plaintiff the injunctive relief he seeks. The Anti-Injunction Act, 28 U.S.C. § 2283, prohibits federal courts from granting an injunction to stay *pending* state court proceedings except where expressly authorized by a congressional act, or necessary in aid of their jurisdiction or to protect or effectuate their judgments. The Act's prohibition cannot be avoided by restraining a party from litigating a particular claim in state court. *See Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 287, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 134 (1970). Even if the Court had subject-matter jurisdiction, therefore, it may only be able to award declaratory relief.

tution, laws, or treaties of the United States." Although the language of section 1331 is virtually identical to the language of Article III, the Supreme Court has held that statutory "arising under" jurisdiction does not extend to as broad a range of cases as does Article III judicial power. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 494–95, 103 S.Ct. 1962, 1971–72, 76 L.Ed.2d 81 (1983). While it is well settled that the scope of section 1331 is more narrow than its constitutional counterpart, the federal judiciary has been unable to clearly define its precise contours. *See* C. Wright, A. Miller & E. Cooper, 13B *Federal Practice and Procedure* 2d § 3562, at 17–48 (1984). The Supreme Court itself has admitted that "the phrase 'arising under' masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system." *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 8, 103 S.Ct. 2841, 2845, 77 L.Ed.2d 420 (1983). To date, no single definition or clear test has been developed for determining when a case "arises under" federal law.[9]

Recently, the Supreme Court shed new light on the scope of statutory federal-question jurisdiction. In *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. ——, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), the Court identified two classes of cases that arise under federal law. According to the Court, the vast majority of cases "arising under" federal law are those in which federal law creates a private cause of action either expressly or by implication. *Merrell Dow,* 478 U.S. at ——, 106 S.Ct. at 3232, 92 L.Ed.2d at 658. The Court, however, recognized that a case also may arise under federal law " 'where the

vindication of a right under state law necessarily turned on some construction of federal law.' " *Id.,* 478 U.S. at ——, 106 S.Ct. at 3233, 92 L.Ed.2d at 659 (quoting *Franchise Tax Board,* 463 U.S. at 9, 103 S.Ct. at 2846).[10]

In *Merrell Dow* the parties agreed that the federal law in question, the Federal Drug and Cosmetic Act (FDCA), did not expressly create or imply a private federal cause of action. *Merrell Dow,* 478 U.S. at ——, 106 S.Ct. at 3234, 92 L.Ed.2d at 660. The question before the Court, therefore, was "whether the incorporation of a federal standard in a state law private action, when Congress has intended that there not be a federal private action for violations of that federal standard, makes the action one 'arising under the Constitution, laws, or treaties of the United States.' " *Id.* 478 U.S. at ——, 106 S.Ct. at 3231, 92 L.Ed.2d at 656 (quoting 28 U.S.C. § 1331).

Relying on *Franchise Tax Board,* the petitioner contended that, although the FDCA did not create a federal cause of action, its claim nevertheless arose under federal law because the respondent's alleged violation of the FDCA was a necessary element of a well-pleaded state claim that raised a substantial, disputed question of federal law. *Id.* 478 U.S. at ——, 106 S.Ct. at 3235, 92 L.Ed.2d at 661. In response, the Court noted that its decision in *Franchise Tax Board* did not create an automatic test, but instead, it "recognized the need for careful judgments about the exercise of federal judicial power in an area of uncertain jurisdiction." *Id.* 478 U.S. at ——, 106 S.Ct. at 3235, 92 L.Ed.2d at 662. Ultimately, the Court concluded:

> The congressional determination that there should be no federal remedy for the violation of this federal statute is tantamount to a congressional conclusion

---

**9.** One thing that is clear is that "the question whether a claim 'arises under' federal law must be determined by reference to the 'well-pleaded complaint,' " *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. ——, ——, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650, 658 (1986), and that "a defense that raises a federal question is inadequate to confer federal jurisdiction." *Id.*

**10.** The Court stressed that its decision in *Franchise Tax Board* did not "disturb the long settled understanding that the mere presence of a fed-

eral issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow,* 478 S.Ct. at ——, 106 S.Ct. at 3235, 92 L.Ed.2d at 661. In *Franchise Tax Board* the Court stated that federal-question jurisdiction is appropriate when "it appears that some *substantial,* disputed question of federal law is a necessary element of one of the well-pleaded state claims." *Franchise Tax Board,* 463 U.S. at 13, 103 S.Ct. at 2848 (emphasis added).

that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently "substantial" to confer federal-question jurisdiction.[11]

*Id.*

Pursuant to the Supreme Court's decision in *Merrell Dow,* therefore, this Court's first task is to determine whether the PKPA creates, either expressly or by implication, a private cause of action in federal court to enforce its provisions. The PKPA clearly does not expressly authorize a private federal cause of action. In fact, the PKPA fails to expressly provide for any enforcement mechanism. Even those courts holding that subject-matter jurisdiction exists agree with these propositions. The pertinent inquiry here then is whether a private federal cause of action is implicit in the PKPA's statutory scheme. The main focus of this inquiry must be on the intent of Congress. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 377–78, 102 S.Ct. 1825, 1838–39, 72 L.Ed.2d 182, 200–201 (1982). Congressional intent may be discerned from the language and legislative history of the act in question, the general legislative scheme, the identity of the class for whose benefit the act was enacted, and the traditional role of the states in such matters. *Id.* 456 U.S. at 377, 102 S.Ct. at 1839 n. 60, 72 L.Ed.2d at 200 n. 60.

Although plaintiff clearly is a member of the class of people for whose benefit the PKPA was enacted, the language and legislative history of the PKPA, its overall legislative scheme, and the traditional role of both state and federal courts in the enforcement of child custody determinations indicate that Congress intended not to create a private federal cause of action to enforce the PKPA's provisions. Instead,

this Court agrees with both the D.C. and Ninth Circuits, and the Western District of Wisconsin that Congress intended only to prescribe a rule of decision for state courts that would be enforced as the full faith and credit clause and its statutory counterpart, 28 U.S.C. § 1738, traditionally have been enforced. *See Rogers,* 814 F.2d at 691; *Thompson,* 798 F.2d at 1556; *Crouse,* 658 F.Supp. 1522.[12]

The language of the PKPA itself, Congress' stated findings, and the PKPA's stated purposes, like the language of the full faith and credit clause and 28 U.S.C. § 1738, is specifically directed towards state courts. *See Thompson,* 798 F.2d at 1552–53. Nowhere does the PKPA mention any role for federal courts. The PKPA was codified by Congress at 28 U.S.C. § 1738A as an addendum to 28 U.S.C. § 1738. It was entitled "Full faith and credit given to state custody determinations." As the D.C. Circuit noted in *Rogers,* it was consistently referred to throughout the legislative history as a "full faith and credit approach." *Rogers,* 814 F.2d at 690. This Court assumes that Congress, at the time it enacted the PKPA, was well aware of the fact that the Supreme Court had held that neither the full faith and credit clause nor 28 U.S.C. § 1738 provided a source of federal-question jurisdiction, *see Wisconsin v. Pelican Insurance Co.,* 127 U.S. 265, 291–92, 8 S.Ct. 1370, 1374–75, 32 L.Ed. 239, 8 S.Ct. 1370 (1888), and of the traditional way in which those provisions were enforced. *See Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979). If Congress had intended the PKPA to be enforced any differently, it surely would have said so.[13] As the Ninth Circuit noted in *Thompson:*

---

**11.** The Court noted that the ultimate import of concluding that Congress did not intend the FDCA to create a private cause of action enforceable in federal court is "that it would flout congressional intent to provide a private federal remedy for the violation of the federal statute." *Merrell Dow,* 478 U.S. at ——, 106 S.Ct. at 3235, 92 L.Ed.2d at 661.

**12.** The traditional way in which the full faith and credit clause and 28 U.S.C. § 1738 have

been enforced is by appeal through the state court system and by writ of certiorari to the Supreme Court. *See Union National Bank v. Lamb,* 337 U.S. 38, 39, 69 S.Ct. 911, 912, 93 L.Ed.2d 1190, 1193 (1949).

**13.** The Third Circuit, in *Flood v. Braaten,* attempted to distinguish the PKPA from the full faith and credit clause and 28 U.S.C. § 1738 on three grounds. First, the Third Circuit claimed that the PKPA imposed a "less flexible rule"

It seems highly unlikely Congress would follow the pattern of the Full Faith and Credit Clause and section 1738 by structuring section 1738A as a command to state courts to give full faith and credit to the child custody decrees of other states, and yet, without comment, depart from the enforcement practice followed under the Clause and section 1738.

*Thompson,* 798 F.2d at 1556.

The legislative history of the PKPA provides further evidence of Congress' intent not to create a private cause of action in federal court. As the Ninth Circuit noted, "the problem identified by Congress was not the absence of a federal cause of action, but lack of uniform standards governing assertion of jurisdiction over child custody matters by state courts."[14] *Thompson,* 798 F.2d at 1554. The legislative history indicates that Congress intended to limit federal involvement under the PKPA to creating and providing access to the Federal Parent Locator Service and to permitting prosecution of abducting parents under the Fugitive Felon Act.[15] In a joint congressional hearing on the Senate version of the PKPA, Congressman John Duncan stated:

> Though I would prefer to have this question addressed at the state level, it has not been. For this to happen would require all 50 States to subscribe to the [UCCJA], both in letter and in spirit, and make it impossible for any parent to find a safe haven to harbor a child taken contrary to a court order across a State line. I don't believe we can except [sic] this level of cooperation.... [but] by reserving the Federal role to the creation

of a Federal Locator Service and FBI investigation after a sufficient lapse of time, we hold Federal interference to a minimum.

Parental Kidnapping Prevention Act of 1979: Joint Hearing on S. 105 Before the Subcomm. on Criminal Justice of the Comm. on the Judiciary and the Subcomm. on Child and Human Development of the Comm. on Labor and Human Resources, 96th Cong., 2d Sess. 20 (1980) (statement of Congressman John J. Duncan).

The legislative history also indicates that Congress considered expanding the federal role under the PKPA, but declined to do so. *See Rogers,* 814 F.2d at 692–694; *Thompson,* 798 F.2d at 1556–1558 (both cases discussing the Department of Justice's position and Congressman Fish's proposal to confer jurisdiction on federal district courts over private actions to enforce custody decrees against parents who remove children to another state in violation of such decrees).

Finally, the enforcement of child custody decrees has traditionally been the province of state courts. Federal courts, on the other hand, traditionally have abstained from exercising diversity jurisdiction over cases that would involve them in deciding the merits of domestic relations disputes. *See Firestone v. Cleveland Trust Co.,* 654 F.2d 1212, 1215 (6th Cir.1981). In *Flood* the Third Circuit argued that "[i]dentifying the errant state court under § 1738A requires only preliminary inquiry into jurisdictional facts," and that "a federal court could *in certain cases* enforce a decree

---

than either the full faith and credit clause or section 1738. *Flood,* 727 F.2d at 309. Second, the PKPA, unlike either the full faith and credit clause or section 1738, provided "specific rules to determine the one state ... that can take jurisdiction to modify a custody decree." *Id.* Finally, the PKPA, unlike the full faith and credit clause and section 1738, prohibits concurrent proceedings on the same child custody matter. *Id.* Although these distinctions may be valid, they do not evidence an intent on the part of Congress to provide a private federal cause of action.

**14.** Prior to the PKPA, a number of states attempted to deal with this problem by enacting

the Uniform Child Custody Jurisdiction Act (UCCJA), 9 U.L.A. §§ 1–28 (1979). Because a number of states did not adopt the UCCJA, however, the problem persisted. The PKPA was, in effect, a manifestation of Congress' intent to require all states to adopt the UCCJA. *See Thompson,* 798 F.2d at 1555 n. 13. The legislative history indicates that Congress was aware that the UCCJA was enforceable only in state courts. *Id.* at 1555 n. 14. Again, if Congress intended the PKPA to be enforced differently, it would have said so.

**15.** *See* 42 U.S.C. § 663 (1983) and 18 U.S.C. § 1073 (1976 & Supp. 1987).

without becoming enmeshed in the underlying custody dispute." *Flood,* 727 F.2d at 310 (emphasis added). In *many cases,* however, federal courts would necessarily be required to consider facts relevant to the underlying dispute in the process of making its jurisdictional inquiry. *See Rogers,* 814 F.2d at 691; *Thompson,* 798 F.2d at 1558–59. If Congress intended to involve federal courts in a class of cases that federal courts traditionally refrained from entering, it would have done so expressly.[16]

■ The Third, Fourth, Fifth, and Eleventh Circuits' major justification for concluding that subject-matter jurisdiction exists in these cases appears to be based on a fundamental distrust of state courts. These circuits have assumed that without a federal forum in which to enforce the PKPA's provisions, the PKPA would be rendered "nugatory," and Congress' purpose in enacting the PKPA "thwarted." *See, e.g., Flood,* 727 F.2d at 312. This Court, however, refuses to assume that state court judges would, in violation of the supremacy clause of the Constitution and their oaths of office, refuse to apply the PKPA in an appropriate manner.[17]

■ For the reasons stated above, the Court dismisses plaintiff's complaint.[18]

**16.** As the D.C. Circuit recognized in *Rogers,* it is important to note that by accepting jurisdiction over these types of cases, federal district courts would be exercising "quasi-appellate federal jurisdiction." *Rogers,* 814 F.2d at 689–90. By exercising such jurisdiction, federal district courts arguably would be acting contrary to the well-settled principle that appellate review of state court resolutions of federal law rests solely with the Supreme Court. *See District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 76, 103 S.Ct. 1303, 1311, 75 L.Ed.2d 206, 218 (1983). *See also* 28 U.S.C. § 1257 (1966 & Supp.1987).

Furthermore, a federal district court, in making its jurisdictional inquiry, would be required to review the state court's determination that it had subject-matter jurisdiction to issue the custody determination in question *under its own laws.* Such an intrusion into state court systems clearly is unwarranted absent affirmative congressional action sanctioning such an intrusion.

**17.** After reviewing Alabama case law, this Court is convinced that the Alabama Courts of Civil Appeals and the Alabama Supreme Court have applied the PKPA in the cases before them and that there is no reason to believe that they would refuse to do so in this case. *See, e.g., Blanton v. Blanton,* 463 So.2d 158 (Ala.1984); *In re McBride,* 469 So.2d 645 (Ala.Civ.App.1985). Plaintiff may appeal the Alabama court's order to the appropriate appellate court pursuant to Ala.Code § 12–22–6 (1986) and Alabama Rule of Appellate Procedure 4.

**18.** Because the Court concludes that Congress intended not to create a private federal cause of action under the PKPA, it would "flout" congressional intent to conclude that plaintiff's claim nevertheless "arises under" federal law. *See Merrell Dow,* 478 U.S. at ——, 106 S.Ct. at 3235–36, 92 L.Ed.2d at 661–62.